UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BENJAMIN E. SMITH,

      Petitioner,

v.                                   Case No. 6:15-cv-1662-Orl-28-DAB

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,

      Respondents.

_____

## ORDER

Petitioner, Benjamin E. Smith ("Smith"), initiated this action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). Respondents filed a Response to the Petition in accordance with this Court's instructions. (Doc. 13). Smith thereafter filed a Reply to the State's Response (Doc. 16), and then an Amended Reply to the State's Response. (Doc 18). For the reasons set forth below, the petition is denied.

### I.    PROCEDURAL HISTORY

The procedural history is lengthy and spans nearly twenty years. In August 1998, a grand jury returned an indictment charging Smith with first degree murder, attempted first degree murder, and attempted burglary of a vehicle. (Doc. 14-1 at 65-66). In May 2000 a jury found Smith guilty as charged (Doc. 14-2 at 80-84), and the trial judge sentenced him to life for first degree murder, fifteen years for attempted first degree murder, and three years for attempted burglary. (Doc. 14-2 at 96-98). Smith appealed.

(Doc. 14-6 at 2). The Florida Fifth District Court of Appeal (the "Fifth DCA") affirmed *per curiam* in May 2001. (Doc. 14-6 at 85).

Smith filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure in April 2003. (Doc. 14-6 at 90). The trial court denied the motion in September 2004. (Doc. 14-7 at 96). Smith appealed (Doc. 14-8 at 2), and the Fifth DCA affirmed *per curiam* in February 2005. (Doc. 14-8 at 62).

Smith filed a second motion for post-conviction relief in March 2006. (Doc. 14-8 at 67, 77). This motion challenged his conviction on the ground of newly-discovered evidence. Smith argued that one of the State's witnesses (Mazie Pauldo) recanted her earlier identification of him as the shooter and that, without this identification, the State could not prove its case against him. The trial court denied this motion in March 2008. (Doc. 14-9 at 53). Smith appealed (Doc. 14-9 at 58), and the Fifth DCA reversed and remanded for an evidentiary hearing. (Doc. 14-9 at 99).

The trial court conducted an evidentiary hearing and, at the conclusion, granted Smith's motion and ordered a new trial. (Doc. 14-10 at 335, 338). The State appealed (Doc. 14-10 at 341), and the Fifth DCA reversed and remanded in January 2011, instructing the trial court to determine whether there was sufficient evidence to find police or prosecutorial misconduct. (Doc. 14-11 at 2).

After an evidentiary hearing in March 2011, the trial court determined that there was insufficient evidence to support findings of misconduct. (Doc. 14-11 at 32). Smith appealed (Doc. 14-11 at 35), and the Fifth DCA affirmed *per curiam* in March 2013. (Doc. 14-11 at 89). Smith filed a motion for rehearing (Doc. 14-11 at 91), which the Fifth DCA

denied in April 2013. (Doc. 14-11 at 97).

Smith then sought a writ of mandamus from the Florida Supreme Court. (Doc. 14-11 at 149). That Court denied the writ in December 2013. (Doc. 14-11 at 173). Smith next sought a similar writ from the Fifth DCA. (Doc. 14-11 at 175). The Fifth DCA denied the writ in September 2014. (Doc. 14-11 at 188).

Smith now seeks habeas relief in this Court, claiming actual innocence and a violation of his constitutional rights based on police and prosecutorial misconduct in connection with the investigation that led to his arrest and the prosecution that followed. (Doc. 1).

## II.    BACKGROUND

In 1996, a group of family members and friends attended an event at the Citrus Bowl in Orlando. (Doc. 14-3 at 215). As the group returned to the parking lot Terry Manley saw a Black male acting suspiciously in the area where the group had parked. (Doc. 14-3 at 217). Manley approached and saw someone inside one of the vehicles. (Doc. 14-3 at 220). Manley startled the individual, causing him to flee, but not before the individual brandished a gun. (Doc. 14-3 at 221-22). Manley, along with three other members of the group (Ellis Tapley, Kenneth Dozier and Lee Keith) began to chase the suspect (Doc. 14-3 at 222-23). During the chase, the suspect shot Tapley and Dozier (Doc. 14-3 at 230); Tapley died at the scene. (Doc. 14-3 at 231). Mazie Pauldo witnessed Tapley's shooting from her car, which was parked on an adjacent street. (Doc. 14-4 at 56-59). The shooter ultimately eluded capture by his pursuers.

Law enforcement officers investigating the shooting showed Manley, Pauldo and

Keith photo arrays of people in an effort to identify the suspect. Manley and Pauldo identified Smith. (Doc. 14-3 at 232-33 & Doc. 14-4 at 161). Keith could not make a positive identification of the shooter, identifying more than one as possibly being the shooter (including Smith). (Doc. 14-3 at 337, 369-70; Doc. 14-4 at 45-46). Manley, Pauldo, Keith and Tommy Whitmer (the deceased victim's younger brother) later participated in a live lineup that included Smith. Manley also could not make an identification. (Doc. 14-3 at 233-34). But Pauldo and Whitmer identified Smith as the shooter. (Doc. 14-4 at 64-65 & Doc. 14-3 at 381-82). Keith identified Smith too but conceded he was only 98% sure. (Doc. 14-3 at 338-39).

## A. Trial

### (1) State's Case-in-Chief

The case proceeded to trial and the prosecution emphasized the witnesses' earlier identifications of Smith. The bulk of the evidence in the State's case-in-chief was testimony about the witnesses' respective identifications of Smith in photographs and at the live lineup. This testimony included the following:

a. <u>Terry Manley.</u> Manley testified that law enforcement showed him photographs after the incident and that he recognized Smith. (Doc. 14-3 at 232-33). But he acknowledged he could not identify the shooter at the live lineup. (Doc. 14-3 at 233-34). Defense counsel cross-examined Manley about certain inconsistencies between his contemporaneous description of the shooter and Smith's appearance at trial. (Doc. 14-3 at 250).

b. <u>Lee Keith.</u> Keith testified that he had identified Smith at the live lineup

(Doc. 14-3 at 338), but acknowledged that he was not "one hundred percent" certain about the identification, being only "about ninety-eight percent" sure. (Doc. 14-3 at 338-39). Defense counsel impeached Keith on cross-examination with prior, equivocal statements about whether he saw the shooter's face. (Doc. 14-3 at 354). The trial judge ultimately read Keith's earlier statements and instructed the jurors to give them whatever weight they believed appropriate. (Doc. 14-3 at 357-59).

c. <u>Tommy Whitmer.</u> Whitmer (who was ten years old at the time of the shooting) testified that he recognized Smith at the live lineup. (Doc. 14-3 at 381-82). Whitmer said that when Smith ran past him the night of the shooting, Smith was fifteen to twenty feet away from him (Doc. 14-3 at 406); on cross-examination, however, this testimony was impeached with earlier statements in which he indicated Smith was a block away (Doc. 14-3 at 408), and Smith was a couple blocks away. (Doc. 14-3 at 414). Counsel also cross-examined Whitmer as to the length of time he saw Smith and Whitmer acknowledged he saw him for a "matter of seconds" as he ran past. (Doc. 14-3 at 406).

d. <u>Detective Glen Gause.</u> Gause testified that within days of the shooting he showed Manley various photographs that did not include Smith's photograph and that Manley did not identify the shooter in any of those photographs. (Doc. 14-4 at 37). But Gause explained that when he showed Manley additional photographs about two months later that included Smith's photograph, Manley identified Smith as the shooter. (Doc. 14-4 at 44). Gause also showed various photographs to Keith, who identified three possible individuals as the shooter, one of whom was Smith. (Doc. 14-4 at 45-46). Gause described Whitmer's identification saying Whitmer's lip quivered and he began to cry

when he saw the individuals in the live lineup but that he held up four fingers to indicate the person he saw on the night of the shooting – the ordinal position that Smith occupied in the lineup. (Doc. 14-4 at 46-47).

      e.    <u>Mazie Pauldo.</u> Pauldo testified she saw the shooter "square in the face" and "clearly". (Doc. 14-4 at 61-62). Police showed Pauldo various photographs over the succeeding months (Doc. 14-4 at 63), and she eventually recognized Smith in one of them. (Doc. 14-4 at 63-65). Pauldo identified "number four" as the shooter at the live lineup. (Doc. 14-4 at 64-65). Pauldo acknowledged she had been convicted of four felonies and that she had also been convicted of a misdemeanor involving the making of false statements. (Doc. 14-4 at 65-66).

      On cross-examination, Pauldo conceded that the suspect's knuckles as described in her statement to police did not resemble Smith's knuckles as they appeared at trial. (Doc. 14-4 at 116, 126). She also conceded that the suspect's height as she described it to police was not consistent with Smith's actual height (Doc. 14-4 at 118, 126), and the suspect's hair as she described it to police was not consistent with Smith's hair as it appeared at trial. (Doc. 14-4 at 116, 128). She also admitted that she told the police the shooter was between the ages of sixteen and nineteen, several years younger than Smith's age at the time of the shooting. (Doc. 14-4 at 97, 99 & Doc. 14-2 at 90). Pauldo's cross-examination ended with a question about whether Smith was the man she saw. She answered in relevant part: "I don't know." (Doc. 14-4 at 128).

      f.    <u>Detective Glen Gause.</u> On recall by the State, Gause testified that Pauldo was shown more than one hundred photographs but eventually recognized the shooter

when shown Smith's photograph. Gause recounted that upon being shown Smith's photograph Pauldo stated "that's your shooter." (Doc. 14-4 at 161).

(2)     Defense Case-in-Chief

Smith's basic defense was that law enforcement arrested the wrong man and the shooter was actually his cousin, Vincent Hubbard, a Georgia resident who was staying with Smith's family at the time of the shooting. The testimony included the following:

a.     <u>Pauline Gibson.</u>  Pauline Gibson, Smith's mother (Doc. 14-4 at 193), testified that Smith entered her house before the gunfire began (Doc. 14-4 at 196-97), and that Hubbard entered after it ended. (Doc. 14-4 at 199). But on cross-examination, Pauline acknowledged that she did not tell anyone that Hubbard entered the house after the gunfire ended until Smith was charged with first degree murder. (Doc. 14-4 at 252-53).

b.     <u>Charles Gibson.</u>  Charles Gibson is Smith's stepfather. (Doc. 14-4 at 274). Gibson confirmed on cross-examination that Pauline did not say anything about Hubbard being outside at the time of the shooting until after Smith's arrest. (Doc. 14-4 at 292).

c.     <u>Tyra Proctor</u>.  Tyra Proctor, Smith's friend (Doc. 14-4 at 299), testified that she and Smith were talking on the phone at the time of the shooting and that she could hear gunfire in the background. (Doc. 14-4 at 302). Proctor heard "someone yelling, get back, I have a gun. I'll shoot." (Doc. 14-4 at 301-02). But the prosecution impeached Proctor on cross-examination with an earlier statement in which she did not mention hearing someone yell "I have a gun" or "I'll shoot". (Doc. 14-4 at 317).

d.     <u>Petitioner Benjamin Smith.</u>  Smith identified a photograph of himself taken

at or about the time of the shooting with his hair in an afro style. (Doc. 14-4 at 362-63). He acknowledged on cross-examination that he had previously been convicted of four felonies. (Doc. 14-4 at 374-75).

e.    <u>Tracy Demunck.</u> Demunck is Pauline Gibson's neighbor. (Doc. 14-5 at 10). Demunck testified she heard gunshots and screams outside her home (Doc. 14-5 at 11), and saw Pauline Gibson and Smith come out of Pauline's house about ten to fifteen minutes after the shooting stopped. (Doc. 14-5 at 16). She spoke with Pauline who told her that she and Smith were in her house at the time of the shooting. (Doc. 14-5 at 17-18). Demunck confirmed on cross-examination that Pauline did not say anything about Hubbard being outside at the time of the shooting. (Doc. 14-5 at 21-22). Demunck also acknowledged that she did not hear anyone say "I've got a gun, get back, I'm going to shoot you." (Doc. 14-5 at 22).

f.    <u>Detective Glen Gause.</u> Smith also called Gause as a witness. Gause testified that Smith's family members identified Vincent Hubbard as a suspect in the shooting (Doc. 14-5 at 49). Gause travelled to Georgia and met with Hubbard and Hubbard's father. (Doc. 14-5 at 50). Gauze explained that Hubbard did not fit the description of the suspect. (Doc. 14-5 at 51).

> We were looking for someone that had a mustache, was older, had a gut. And when looking at [Hubbard] he couldn't grow any hair, if he wanted to, especially on his upper lip. He had no gut at that time. He was broad shouldered but he was solid, real solid kid. Football player.

(Doc. 14-5 at 51). Gauze continued:

> What [Mazie Pauldo] and other witnesses had said, the other witness had said how the person was running and would have to stop intermittently.

-8-

And then [Mazie] later said this person appeared to be out of breath when he got to her point. And so this kid here was a running back for a football team and did not appear to be for that short of a distance to run out of gas or anything.

(Doc 14-5 at 52). Gauze spoke with Smith before the live lineup and Smith never suggested that Hubbard was involved in the shooting. To the contrary, Smith said that Hubbard was in the house at the time of the shooting. (Doc. 14-5 at 77). Gause told Smith that Smith was a suspect. (Doc. 14-5 at 77).

       g.    <u>Lorisa Gibson.</u> Lorisa Gibson is Smith's sister. (Doc. 14-5 at 133). Lorisa testified that she spoke with Hubbard the day after the shooting and he appeared "very nervous and scared." (Doc. 14-5 at 136). Lorisa noticed scratches on Hubbard's arm. (Doc. 14-5 at 148). According to Lorisa, the day after the shooting, Hubbard admitted to her that he was the shooter. (Doc. 14 -5 at 138). Lorisa acknowledged on cross-examination, however, that she did not tell Smith's lawyer about Hubbard's confession even after the lawyer told her that Smith had been arrested for murder. (Doc. 14-5 at 158-60). Lorisa also acknowledged she did not contact the police to tell them about Hubbard's confession until after Smith's arrest, approximately two and one-half years after Hubbard's alleged confession. (Doc. 14-5 at 168). Lorisa conceded at the end of cross-examination that she was testifying to keep her brother from going to prison. (Doc. 14-5 at 169).

       h.    <u>Carl Patrick.</u> Patrick is the father of Lorisa Gibson's children. (Doc. 14-5 at 178). Patrick testified that he saw Hubbard after the shooting with scratches on his arm (Doc. 14-5 at 180), describing Hubbard as "scared", "paranoid" and "shaking". (Doc. 14-5 at 180). Patrick said that Hubbard bragged several months later about getting away

with the shooting. (Doc. 14-5 at 182-83). But Patrick admitted on cross-examination that he did not contact police about Hubbard's statements (Doc. 14-5 at 187), even after Smith's arrest (Doc. 14-5 at 190), and, in fact, did not tell anyone. (Doc. 14-5 at 187).

     i.     <u>Petitioner Benjamin Smith.</u> Smith was again called to testify. He explained that on the day of the shooting, he returned to his mother's home shortly before the shooting. (Doc. 14-5 at 205-08). Soon after entering the house, Smith telephoned Proctor. (Doc. 14-5 at 210). While he was talking to Proctor, he heard shots outside. (Doc. 14-5 at 210). Smith said he went downstairs and Hubbard ran into the house (Doc. 14-5 at 214), appearing "frightened" and "just [a] different person." (Doc. 14-5 at 216). Smith saw Hubbard the next day and Hubbard had cuts on his arm (Doc. 14-5 at 220). According to Smith, Hubbard later admitted to him that he was the shooter. (Doc. 14-5 at 226-27). But Smith conceded on cross-examination that he did not tell the police about Hubbard's confession at the time because "it ain't my problem" (Doc. 14-5 at 227), and did not tell law enforcement about Hubbard's admission even after learning he was a suspect in the shooting (Doc. 14-5 at 230), or later when he was arrested. (Doc. 14-5 at 244). Smith also admitted that he had earlier told investigators a different story — that he knew Hubbard was not the shooter because Hubbard was at home when the shooting occurred. (Doc. 14-5 at 230-31).

     j.     <u>Vincent Hubbard.</u> Hubbard was in his room at the Gibson house at the time of the shooting. (Doc. 14-5 at 101). He explained that gun shots woke him and he went downstairs (Doc. 14-5 at 102), at which time he could hear people and sirens outside. (Doc. 14-5 at 103). He denied telling Smith or Smith's sister that he was the shooter (Doc.

14-5 at 113), reiterating that he did not have anything to do with the shooting. (Doc. 14-5 at 121). Hubbard agreed to be fingerprinted at Gause's request. (Doc. 14-5 at 126).

### (3)    State's Rebuttal

Randy Joslyn, a fingerprint examiner for the Orlando Police Department (Doc. 15-5 at 270), testified he compared Hubbard's fingerprints to those obtained at the crime scene and they did not match. (Doc. 14-5 at 271).

### B.    Petitioner's Second Motion for Post-Conviction Relief[1]

### (1)    Trial Court Denies Motion and is Reversed on Appeal

Smith filed a second motion for post-conviction relief in which he argued that newly-discovered evidence justified a new trial. (Doc. 14-8 at 67, 77).[2] Smith asserted that because Pauldo recanted her earlier identification of him as the shooter, the State would not have been able to prove its case against him.

In support of the motion, Smith submitted the transcript of his attorney's interview with Pauldo in which Pauldo alleged police and prosecutorial misconduct.[3] (Doc. 14-8 at 104-56). At the conclusion of the interview, Pauldo was asked about the identity of the

---

[1] Petitioner's first motion for post-conviction relief was summarily denied without a hearing. (Doc. 14-7 at 96-103).

[2] Smith was represented by counsel in connection with his second motion for post-conviction relief. (Doc. 14-8 at 90).

[3] These allegations included: she was threatened with jail if she refused to participate in the case (Doc. 14-8 at 121, 124, 127); she did not look carefully at the photographs of suspects shown to her by law enforcement and identified Smith in an effort to avoid additional involvement (Doc. 14-8 at 130-31); she was told if she selected Smith she would receive a reward (Doc. 14-8 at 126-27); she was shown a photograph of Smith immediately before the lineup (Doc. 14-8 at 135), and told not to tell anyone she had been shown the photograph (Doc. 14-8 at 136); she heard other witnesses discuss who to pick after viewing the lineup (Doc. 14-8 at 139); and she believed Smith was the only person in the lineup who looked "thuggish". (Doc. 14-8 at 140-41).

shooter:

> Q: Anything else you can remember about that, or anything that – and again, I'm asking you to kind of speculate, but why they were so insistent that you pick that person in that one picture?

> A: I don't know. I don't know why they wanted me to pick him so bad. I mean, they really felt that that was him.

> Q: Yeah.

> A: They felt that he was the shooter and they were reassuring me, like this is him, you know, but they needed me, like this is him, you know, but they needed me to say it was him because they feel I was the main eyewitness that seen everything that night; but I don't, I really don't know. And even to this day, I mean, I can still close my eyes and visualize that incident cause it was awful –

> Q: I bet.

> A: -- I mean, it was awful. But even yet, it still doesn't look like him, it doesn't look – the guy that I seen that night doesn't look like the guy I seen in court. You know what I mean.

> Q: Right.

> A: And this is what, six, seven years later, you know, and it's – it's not the same person. The guy I saw was darker and younger and more heavyset. And I explained that to them, you know, but --

(Doc. 14-8 at 154-55).

The trial court denied the motion (Doc. 14-9 at 53), reasoning that the evidence was not "newly discovered" because the documents Smith used to support the motion were available five months before the trial court denied his earlier, initial motion for post-conviction relief. (Doc. 14-9 at 54). The trial court separately noted that Pauldo's identification of Smith at trial was so equivocal there was not any "reasonable probability that [her] recantation would result in a different outcome at trial." (Doc. 14-9 at 55).

The Fifth DCA reversed and remanded for an evidentiary hearing, concluding that Smith's second motion was not procedurally barred (Doc. 14-9 at 109), and that the trial court unreasonably down-played the significance of Pauldo's new testimony. (Doc. 14-9 at 110).

**(2)     Trial Court Holds Evidentiary Hearing and Grants Motion for Relief**

The trial court thereafter conducted an evidentiary hearing, during which it heard the following testimony:

a.     <u>Mazie Pauldo.</u> Pauldo acknowledged that Smith may or may not have been the shooter. (Doc. 14-9 at 224). Pauldo testified:

Q:     All right. Well, you knew you picked the wrong person way back before the trial even started, correct?

A:     Well, I knew that –

Q:     At the Citrus Bowl?

A:     I knew that he wasn't the exact – I knew that I couldn't say that he was the person I seen that night. So I don't know if he shot them people or not. I don't know.

Q:     Well, that's very important, because it sounded like you were saying today that you know that he is not the right person that was the shooter.

A:     I did not say that when it first began, when I first talked to detective, when I went and got the police officers during the shooting. I didn't say then that I could 100 percent say that he was the guy. Then I was only able to describe the guy's hands, the color of his skin and the clothes that he was wearing.

Q:     Correct. And all that came out at trial, correct?

A:     Right. Right

Q: Okay. Other than the fact that you're saying the police put pressure on you to pick out his photograph and pick him out in a line-up, nothing has changed, according – in your own mind, correct, about who the shooter was? It could have been him? May not have been him?

A: It could have been. It could have not been. Right.

Q: So nothing has really changed in that regard, correct, in your mind?

A: Right.

(Doc. 14-9 at 223-24).

Pauldo repeated her allegations about prosecutorial and police misconduct. She testified that law enforcement showed her a photograph immediately before the live lineup to "refresh her memory" and admonished her not to tell anyone she had been shown the photograph. (Doc. 14-9 at 169). She claimed that law enforcement coerced her into identifying a particular suspect as the shooter (Doc. 14-9 at 159, 161; 163; 179), threatening removal of her children to a state agency if she did not comply. (Doc. 14-9 at 166). She explained that she received approximately $3,000 from CrimeLine for her involvement in the case (Doc. 14-9 at 165), but was instructed by the State to deny she received a reward if asked about one at trial. (Doc. 14-9 at 182).

b. Kristell Miles. Miles is a friend of Smith's mother. (Doc. 14-9 at 228-29). Miles was seventeen or eighteen years old at the time of Smith's trial. Miles came to the trial with her mother who wanted to provide Smith with moral support. (Doc. 14-9 at 229-30). Miles overheard a conversation outside the courtroom in which Tommy Whitmer stated he would not have been able to identify Smith in the live lineup were it not for Detective Gause holding up four fingers to help him select Smith (Doc. 14-9 at

230-31). The judge sustained a belated hearsay objection to this testimony. (Doc. 14-9 at 231). Miles also overheard Pauldo say that she was "ready for this to be over" and that she was "going to do what they told her to do." (Doc. 14-9 at 233). Miles acknowledged that she was incarcerated at the time of the evidentiary hearing and had two prior felony convictions, one apparently involving dishonesty. (Doc. 14-9 at 234-36).

      c.      <u>Lee Keith.</u> Keith, one of the four victims, testified about the procedure used at the live lineup. The witnesses viewed the lineup separately (Doc. 14-10 at 11), and each was removed to a separate location after viewing the lineup for purposes of preparing statements about their respective identifications. (Doc. 14-10 at 12). Keith explained the procedure prevented the witnesses from communicating after one of them viewed the lineup (Doc. 14-10 at 12), and he did not see any of the other witnesses until all of them completed their statements. (Doc. 14-10 at 12.)

      d.      <u>Detective John Parks.</u> Parks also testified about the procedure used at the live lineup. His testimony was consistent with Keith's testimony – the witnesses viewed the lineup separately and then were removed to separate locations to prepare statements regarding their identifications. (Doc. 14-10 at 24-25). Parks confirmed the witnesses were separated after viewing the lineup so they could not communicate their experience with one another. (Doc. 14-10 at 25). Parks did not threaten Pauldo if she failed to identify Smith (Doc. 14-10 at 26), and he did not show her any photographs immediately before the lineup to ensure she would pick a particular person. (Doc. 14-10 at 26).

      e.      <u>Detective Glen Gause.</u> Gause confirmed Parks' testimony about the manner in which the live lineup was conducted, testifying the witnesses viewed the

lineup separately and were removed to another location to prepare statements regarding their respective selections. (Doc. 14-10 at 51). Additional detectives were assigned to ensure there were no communications between the witnesses who had already seen the lineup or between them and the witnesses who had not yet seen the lineup. (Doc. 14-10 at 52). Smith's counsel was present for the lineup and did not complain about any of the procedures that were used. (Doc. 14-10 at 52-53). Gause did not show Pauldo any photographs immediately before the lineup (Doc. 14-10 at 54-55); he never threatened Pauldo if she failed to select Smith from a photo array or at the lineup (Doc. 14-10 at 55-56); he never promised or suggested that Pauldo would be entitled to a reward if she identified a particular person as the shooter (Doc. 14-10 at 57-58); and he did not instruct Pauldo to deny she received a reward if asked. (Doc. 14-10 at 64-65).

f.     Jeffrey Ashton. Ashton was the prosecutor at Smith's trial. (Doc. 14-3 at 3). Ashton testified about the procedures used at the live lineup and confirmed Parks' and Gause's testimony about the manner in which the witnesses were separated after viewing the lineup. (Doc. 14-10 at 115). Ashton expressly disclaimed any "hanky panky" during the lineup (Doc. 14-10 at 117-18), and stated that he never received any information suggesting that Pauldo had been pressured in any way during the investigation. (Doc. 14-10 at 122). Ashton also testified that Pauldo's allegations that she was directed to deny the existence of a reward "never happened." (Doc. 14-10 at 123).

Following the hearing, the trial court granted Smith's motion for relief and ordered a new trial. (Doc. 14-10 at 335). The court's order found that Pauldo's testimony was the sole basis for Smith's conviction; that her credibility would be a significant factor in

resolving the case; and that information relating to the $3,000 reward should have been shared with the jury because it impacted her credibility. (Doc. 14-10 at 338).

(3)     Fifth DCA Reverses and Remands for Findings Regarding Misconduct

The Fifth DCA reversed but remanded the case for the limited purpose of determining whether there was sufficient evidence to find police or prosecutorial misconduct. (Doc. 14-11 at 2). The Fifth DCA explained:

> The appealed order is deficient in two respects. First, the order lacks any findings. Even if the statements made by the trial court could be characterized as findings supporting the order, they leave this Court unable to determine whether the order granting a new trial to [Smith] can be sustained on any basis. Also, the statements made by the trial court suggest the decision was based on evidence received at the evidentiary hearing concerning Ms. Pauldo's receipt of tip reward money.
>
> The fact that the jury never learned that Ms. Pauldo received reward money is not an adequate basis to award a new trial based on newly discovered evidence. The supreme court has said that, in order to prevail on newly discovered evidence, the defendant must establish that . . . (4) the evidence goes to the merits of the case and not merely impeachment of the character of the witness . . . . Here, as the trial court observed, the issue of whether Ms. Pauldo received a reward would be, at most, impeachment material.
>
> Second, the trial court's disallowance of testimony concerning the reward was not challenged on appeal. [Smith's] trial counsel attempted to question Ms. Pauldo concerning any inducement she might have been given to testify, but the trial court sustained the state's objection. Assuming that was error, it should have been raised on appeal.
>
> No findings were made by the trial court on Ms. Pauldo's allegations of prosecutorial misconduct, except for the court's observation that Ms. Pauldo was not credible. Given the trial court's finding that Ms. Pauldo was not a credible witness, Ms. Pauldo's allegations concerning prosecutorial misconduct carry little weight.
>
> Finally, there is the question of the recantation of Ms. Pauldo's identification testimony at trial. For reasons unclear on our limited record, Ms. Pauldo apparently did not identify [Smith] in court; rather, her

testimony focused on the photo line-up and again at the show-up identification. She was cross-examined about inconsistencies in her initial description of the assailant from the night of the shooting and [Smith's] actual appearance. Ms. Pauldo claimed that the assailant had dark knuckles, was a young adult, no older than nineteen and was about 5'11 to 6 feet tall. During cross-examination, the following exchange concerning her observations took place . . .

> Q: Ma'am, take a look at him. That's not the man you saw that night, is it?
>
> A: He looks a little different now. I mean he's not dark and [he] has more hair.
>
> Q: He's not the man you saw, is it?
>
> A: I don't know. What you want me to say to that one?
>
> Q: I want you to you tell the truth.
>
> A: It's not the guy that – he doesn't look the same from the picture or lineup.

Based on the foregoing, we reverse the new trial order, but, out of an abundance of caution, we remand to the trial court so that express findings can be made, if warranted, on the claim of prosecutorial and police misconduct, that would support the court's prior decision to grant a new trial.

(Doc. 14-11 at 8-9).

### (4)    Trial Court Finds No Misconduct

The trial court thereafter determined it could not find police or prosecutorial misconduct. (Doc. 14-11 at 32).  At a hearing on the matter, the trial court remarked: "I don't find any evidence of police or prosecutorial misconduct." (Doc. 14-11 at 27).  The trial court entered a written order stating: "[b]ased on all evidence presented and argument presented at the hearing for new trial, this Court does not find sufficient

evidence of prosecutorial misconduct or police misconduct and therefore the motion for new trial is denied on those grounds." (Doc. 14-11 at 32).

### III.   LEGAL STANDARDS

#### A.   Habeas Relief Under the Antiterrorism Effective Death Penalty Act ("AEDPA")

AEDPA provides that habeas relief cannot be granted with respect to a claim adjudicated on the merits in a state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA thus provides three avenues for relief: one based on a determination that the outcome was itself contrary to clearly established federal law; another based on a determination that the outcome was infected by an unreasonable application of the law to the facts; and a third based on an unreasonable determination of the facts themselves.  With respect to the first two, the Supreme Court has explained:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  With respect to the third, the Supreme Court has explained:

We may not characterize . . . state-court factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference. If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"

*Brumfield v. Cain*, 135 S.Ct. 2269, 2277 (2015) (citations omitted).

## B.    AEDPA's Statute of Limitations

AEDPA contains its own statute of limitations. A petition for relief must be filed

not later than one year after:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

This one-year limitations period is not absolute, however. A petition will be

reviewed, despite the passage of time, if the petitioner can establish he is "actually

innocent" in light of new evidence. *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013). A

petitioner establishes innocence in this regard by persuading the district court that "in

light of the new evidence, no juror, acting reasonably, would have voted to find him

guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).[4] In evaluating

the evidence, the district court must "assess how reasonable jurors would react to the

overall, newly supplemented record." *House v. Bell*, 547 U.S. 518, 538 (2006). In so doing:

> the district court is not bound by the rules of admissibility that would
> govern at trial. Instead, the emphasis on "actual innocence" allows the
> reviewing tribunal also to consider the probative force of relevant evidence
> that was either excluded or unavailable at trial. . . . The habeas court must
> make its determination concerning the petitioner's innocence "in light of all
> the evidence, including . . . evidence tenably claimed to have been wrongly
> excluded or to have become available only after the trial."

*Id.* at 327-28 (citation omitted).

### C. AEDPA's Standard for Reviewing State Court Findings of Fact

AEDPA also contains its own standard for reviewing state court findings of fact:

"a determination of a factual issue made by a State court shall be presumed to be correct.

The applicant shall have the burden of rebutting the presumption of correctness by clear

and convincing evidence." 28 U.S.C. § 2254(e)(1). The clear and convincing standard is

highly deferential, even more so than the typical clearly erroneous standard. *Wood v.*

*Allen*, 542 F.3d 1281, 1285 (11th Cir. 2008) (*quoting Stephens v. Hall*, 407 F.3d 1195, 1201

(11th Cir. 2005), *aff'd*, 558 U.S. 290 (2010)). As a result, "where factual findings underlie

the state court's legal ruling, our already deferential review [under AEDPA] becomes

---

[4]Reliability is particularly important when a witness purports to recant earlier testimony. As the Supreme Court explained:

> Recantation testimony is properly viewed with great suspicion. It upsets society's interest
> in the finality of convictions, is very often unreliable and given for suspect motives, and
> most often serves merely to impeach cumulative evidence rather than to undermine
> confidence in the accuracy of the conviction.

*Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984). *See also United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988) ("[R]ecantations are viewed with extreme suspicion by the courts.").

doubly so." *Childers v. Floyd*, 642 F.3d 953, 972 (11th Cir. 2011) (*en banc*). This deference extends to credibility determinations. *Gore v. Sec'y Dept. Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) ("A certain amount of deference is always given to a trial court's credibility determinations. That the case is before us on habeas review heightens that deference.").

## IV.  ANALYSIS

### A.    Smith's Claim is Barred by AEDPA's Statute of Limitations

AEDPA requires a petitioner to file his petition not later than one year (a) after the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review or (b) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. Smith concedes he cannot meet either of these standards for timeliness. (Doc. 1 at 10).

### B.    Smith Cannot Establish Actual Innocence for Purposes of Avoiding the Statute of Limitations

A petition will be considered, notwithstanding the running of the statute of limitations, if the petitioner can demonstrate his "actual innocence" in light of new evidence – which in this context means that no juror, acting reasonably, would vote to find him guilty beyond a reasonable doubt. Smith contends that "Pauldo has recanted her testimony in such a way that had the information we know now been adduced at trial, [Smith] would have been acquitted." (Doc. 1 at 7). Smith's claim – and supporting evidence – fall short of the mark.[5]

---

[5] Smith states that "the facts of this case were determined in attached opinions from the Fifth DCA." (Doc. 1 at 5 n.2). Although the petition does not have these attachments, Smith is presumably referring to

### (1) Pauldo's New Testimony Does Not Establish "Actual Innocence"

Pauldo's new testimony does not establish Smith's actual innocence. Her new testimony, as reflected in her sworn statement and her testimony at the state court evidentiary hearing, amounts to the following – I really don't know whether Petitioner was the shooter. Her sworn statement concludes with the following: "they needed me to say it was him because they feel I was the main eyewitness that seen everything that night; *but I don't, I really don't know;*" "*the guy that I seen that night doesn't look like the guy I seen in court.*" (Doc. 14-8 at 154-155). Her testimony at the evidentiary hearing ended on an equally equivocal note: "*I don't know if he shot them people or not;*" "*It could have been [him]. It could not have been [him].*" (Doc. 14-9 at 223-24).

Pauldo's testimony at the evidentiary hearing can be mined for more definite statements about the identity of the shooter but, when push came to shove, she acknowledged that "[i]t could have been him. It could not have been him." A reasonable juror would not likely give any weight to the more definite statements given Pauldo's ultimate acknowledgement – in each context in which she has been asked – that she does not really know whether Smith is the shooter.

Moreover, Pauldo gave her sworn statement *four years after the trial.* (Doc. 14-8 at 104). Before giving the statement, Pauldo spoke with Smith's aunt who told her: "Mazie,

---

the Fifth DCA's decision ordering an evidentiary hearing. (Doc. 14-9 at 99). The Fifth DCA summarized the facts of the case for purposes of ordering a new trial but that summary is not binding on this Court which must make an independent review of the state court record. *See Ferguson v. Culliver*, 527 F.3d 1144, 1149 (11th Cir. 2008) (independent review required with respect to waiver of assistance of counsel). In addition, the Fifth DCA subsequently denied the very relief the earlier opinion suggested might be available based on its summary of the facts.

you know, my nephew is really innocent, it's really not him, you know;" "[h]e's going to prison for something that he really didn't do;" and that the actual shooter was someone else. (Doc. 14-8 at 150-51). Pauldo also spoke with the brother of Smith's girlfriend. (Doc. 14-8 at 101). Given the passage of time, coupled with the meetings with a family member and a friend that preceded the sworn statement, a reasonable juror would view with suspicion Pauldo's motivation for coming forward.

Pauldo's new testimony does not mean that Petitioner is actually innocent. It means that whatever she said at the original trial about the identity of the shooter must be disregarded and the record re-evaluated to determine whether any reasonable juror would still vote to convict.

### (2) Pauldo's Trial Testimony Was Not Necessary to Convict

Pauldo's trial testimony was not necessary to convict. This Court therefore cannot say that no juror, acting reasonably, would vote to convict beyond a reasonable doubt in the absence of that testimony.

a.     <u>Testimony Offered to Establish Guilt.</u>  The State's case was built around prior identifications of Smith from photo arrays and at a live lineup. Manley testified he saw the suspect up close. (Doc. 14-3 at 221). He chased the suspect for some time (Doc. 14-3 at 223-24), during which the suspect was firing his gun. (Doc. 14-3 at 224). He saw the suspect shoot Tapley. (Doc. 14-3 at 228). Later he identified Smith as the shooter from a photograph shown to him by police. (Doc. 14-3 at 232-33). Gause testified that Manley made the positive photographic identification of Smith approximately two months after the shooting. (Doc. 14-4 at 37, 44). Gause also explained that Manley viewed other photo

arrays *that did not include Petitioner's photograph* and that Manley did not identify a suspect in these other photographs. (Doc. 14-4 at 36-37). A reasonable juror could credit Manley's testimony and convict on this testimony alone.

A reasonable juror would not necessarily discount Manley's photographic identification due to his inability to later identify Petitioner at the live lineup. Manley made the photographic identification *two months* after the shooting while the live lineup occurred *two years* after the shooting. A reasonable juror could conclude that Manley's memory faded over time or that Petitioner's appearance changed over time or both.

Whitmer testified that he identified Smith at the live lineup (Doc. 14-3 at 381-82), but Smith's lawyer challenged this testimony on cross-examination asking about the length of time he saw the suspect, Whitmer admitting it was for a "matter of seconds". (Doc. 14-3 at 406). Defense counsel also impeached Whitmer regarding the distance from which he saw the suspect. Whitmer testified on direct examination that the suspect was fifteen to twenty feet away when he ran past (Doc. 14-3 at 406), but earlier had made a statement that the suspect was a block away (Doc. 14-3 at 408), and another statement that the suspect was a couple blocks away. (Doc. 14-3 at 414). A reasonable juror could credit Whitmer's identification of Smith, despite the inconsistencies between his trial testimony and earlier statements about the distance between himself and the suspect. A reasonable juror could discount the earlier, inconsistent statements because Whitmer was only ten years old at the time of the shooting and therefore unlikely to be able to provide a more precise estimate.

Miles' hearsay account of Whitmer being coached by Gause at the live lineup

would be admissible for impeachment purposes but a reasonable juror could discount her testimony given her bias as a family friend and her prior criminal record, which apparently involves at least one crime involving dishonesty. Assuming such a juror concluded that Whitmer's identification was not legitimate, it would not undermine the probative value of Manley's separate identification.

Keith testified he identified Smith at the live lineup. (Doc. 14-3 at 338). Keith acknowledged he was not "one hundred percent" certain about the identification but rather "about ninety-eight percent" sure. (Doc. 14-3 at 338-339). Defense counsel impeached Keith on cross-examination with prior, equivocal statements about whether he saw the shooter's face. (Doc. 14-3 at 354). A reasonable juror could credit Keith's identification given his confidence level in its accuracy but would likely give this evidence less weight in light of Keith's earlier statement that he did see the shooter's face and another earlier conflicting statement that he did not see the shooter's face.

b.    <u>Testimony Offered to Negate Guilt.</u>  Smith offered the testimony of family members and a friend to support his theory that law enforcement arrested the wrong man and that Hubbard was the actual shooter. Each was impeached with prior inconsistent statements about what they knew and when they knew it. More fundamentally, each was unable to formulate a good answer to the general question "why did you wait so long to say something about Hubbard's involvement"?

For example, Smith admitted he did not tell police about Hubbard's purported confession because "it ain't my problem" (Doc. 14-5 at 227), even after being informed he (Smith) was a suspect (Doc. 14-5 at 230), and even after he (Smith) was arrested. (Doc. 14-

5 at 244). A reasonable juror would infer from Smith's silence – at a time when he had every incentive to speak – that Smith's claim about Hubbard's culpability was an after-the-fact fabrication. A reasonable juror would assume that one who has been wrongfully accused – as Smith contends he was – would disclose highly relevant, exculpatory evidence as soon as possible and as loudly as possible. Yet Smith failed to do so.

Moreover, Smith told Gauze that Hubbard was in the house at the time of the shooting – and did so at a time when he knew that he (Smith) had been identified as a suspect. (Doc. 14-5 at 77). A reasonable juror would not expect a suspect to provide the confessed criminal with an alibi because doing so would increase the potential for the suspect's wrongful conviction. To the contrary, a reasonable juror would expect the suspect to exculpate himself by immediately sharing with law enforcement what he knew about the confessed criminal's involvement.

Similarly, Lorisa Gibson (Smith's sister) purportedly heard Hubbard confess yet she did not reveal this information to Smith's lawyer upon learning from the lawyer that Smith had been arrested for murder. (Doc. 14-5 at 158-60). A reasonable juror would likely be astonished by Gibson's failure to reveal this information to the person best situated to use it for her brother's benefit. A reasonable juror would likely infer from Gibson's silence that her testimony about Hubbard's confession was a sham.

Finally, all the testimony about Hubbard's claimed involvement was contradicted by Hubbard, who testified that he was not the shooter (Doc. 14-5 at 121); by Gause, who testified that Hubbard did not match the description of the shooter (Doc. 14-5 at 51-52); by Joslyn, who testified that Hubbard's fingerprints were not found at the scene (Doc. 14-

5 at 271); and by Manley, Keith and Whitmer, who identified Petitioner as the shooter and/or the person being chased at the time of the shooting. (Doc. 14-3 at 232-33, 338-38, 381-82).

Against this backdrop, a reasonable juror when deliberating the verdict, would likely find the defense implausible. Instead, a reasonable juror would recognize that each witness who testified in support of the defense was biased due to family membership or friendship and conclude that their love and affection for Smith caused them to fabricate a story to prevent him from going to prison.

Given the evidence, this Court cannot say that no reasonable juror would vote to convict Smith beyond a reasonable doubt in the absence of Pauldo's testimony. As such, Smith cannot establish actual innocence and therefore cannot avoid the statute of limitations bar.

## C.    Smith Cannot Establish a Constitutional Violation in Any Event

Assuming Smith were to establish actual innocence and avoid the statute of limitations bar – which he cannot – the petition would still fail because he cannot establish a constitutional violation. Smith raises one ground for relief: prosecutorial and police misconduct in violation of his right to a fair trial and due process. (Doc. 1 at 5). Smith states: "this court should order an evidentiary hearing to permit [Smith] a reasonable opportunity to establish police coercion and/or prosecutorial misconduct has effectively deprived a man who is actually innocent of his rights to due process and a fair trial." (Doc. 1 at 8). The state court addressed this very issue at an evidentiary hearing and ruled: "I don't find *any evidence* of police or prosecutorial misconduct." (Doc. 14-11 at 27)

(emphasis added.). In addition, the state court found the source of these allegations (Pauldo) not credible. (Doc. 14-11 at 23). As the trial court explained in a subsequent written order: "*this Court does not find sufficient evidence* of prosecutorial or police misconduct and therefore the motion for new trial is denied on those grounds." (Doc. 14-11 at 32) (emphasis added).[6]

Smith cannot produce clear and convincing evidence that the trial court's finding is incorrect. The evidentiary hearing produced substantial evidence rebutting Pauldo's allegations of impropriety. Gause denied influencing her selection of a particular photograph (Doc. 14-10 at 47); he denied any irregularities or improprieties in connection with the live lineup (Doc. 14-10 at 52); he denied showing her a photograph of Smith prior to the live lineup for purposes of assisting her identification (Doc. 14-10 at 54-55); he denied threatening jail if she failed to cooperate (Doc. 14-10 at 55-56); he denied making any promises about rewards that might be available to her depending upon her testimony (Doc. 14-10 at 57-58); and he denied telling her to disclaim her potential entitlement to a reward if asked on cross-examination (Doc. 14-10 at 64-65). Ashton denied instructing Pauldo to disclaim eligibility for a reward if asked about it on cross-examination (Doc. 14-10 at 123); he denied Gause coached Whitmer into identifying Smith at the live lineup (Doc. 14-10 at 143); and he denied making any threats to Pauldo about what might happen if she did not cooperate. (Doc. 14-10 at 152). Keith explained that the witnesses

---

[6]The trial judge also remarked: "And I remember even saying that at the original hearing, based on the testimony of Mr. Ashton and the testimony of Detective Gause, that I didn't find their actions rose to the level of misconduct." (Doc. 14-11 at 17).

viewed the lineup separately (Doc. 14-10 at 11) and that each witness was removed to a separate location after viewing the lineup for purposes of preparing statements about their respective identifications. (Doc. 14-10 at 12). Given this evidence – coupled with the trial court's separate finding that the source of the allegations was not credible -- the trial court's refusal to find misconduct is fully justified.

The trial court and the Fifth DCA characterized the issue of police and prosecutorial misconduct as issues of fact, focusing on whether findings should be entered regarding either or both. The trial court's statement that there was no evidence of misconduct implies that it resolved a factual issue – specifically, whether the events alleged by Pauldo did or did not occur. The outcome would not be any different if the issue of misconduct were viewed as one of law or as a mixed question of law and fact. The trial court's factual finding that Pauldo lacked credibility, coupled with all the testimonial evidence contradicting the allegation of misconduct, is sufficient to satisfy even a *de novo* standard of review.

Nor can Smith establish that the state court's finding was unreasonable. The evidence fully justified the trial court's finding that there was no police or prosecutorial misconduct. Smith therefore cannot satisfy the standards for relief under 28 U.S.C. § 2254(d) and his petition must be denied.

Because the allegations of police and prosecutorial misconduct were vetted at a state court evidentiary hearing, there is no need for such a hearing in this Court as requested by Smith. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

-30-

district court is not required to hold an evidentiary hearing.").

## V.    CERTIFICATE OF APPEALABILITY

This Court should grant an application for certificate of appealability only when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Sec'y Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009). When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.; Lamarca*, 568 F.3d at 934. However, a prisoner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). Smith has not demonstrated that reasonable jurists would find this Court's assessment of the constitutional claims debatable or wrong. Moreover, Smith cannot show that jurists of reason would find this Court's procedural rulings debatable. Smith has failed to make a substantial showing of the denial of a constitutional right. Thus, this Court will deny Smith a certificate of appealability.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**. The Clerk of the Court shall enter judgment

accordingly.

> 2. Smith is **DENIED** a Certificate of Appealability.

> 3. The Clerk of the Court is directed to close this case.

DONE AND ORDERED in Orlando, Florida, this 3o day of August, 2017.

JOHN ANTOON II
UNITED STATES DISTRICT JUDGE

Copies to:
OrlP-5 8/30
Benjamin Smith
Counsel of Record